IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GERALD O. ORTON,

                                    Petitioner,                          OPINION AND ORDER

        v.                                                                      17-cv-171-wmc

RANDALL R. HEPP,
Warden, Fox Lake Correctional Institution,

                                    Respondent.

        Pursuant to 28 U.S.C. § 2254, Gerald Orton, a state prisoner presently confined at the Fox Lake Correctional Institution, seeks federal habeas relief from his 2011 conviction for attempted first-degree intentional homicide in the Circuit Court for Dane County, Wisconsin.  Specifically, Orton claims that he is in state custody in violation of the United States Constitution because:  (1) he received ineffective assistance of counsel in connection with his no-contest plea to the charge; (2) the plea was not entered knowingly, voluntarily, and intelligently; and (3) the trial court relied on inaccurate information at sentencing. Orton presented these same three claims to Wisconsin trial and appellate courts, all of which denied him relief, and his bid for federal relief will fare no better.

        As explained in more detail below, the Wisconsin Court of Appeals -- the last state court to adjudicate these claims on the merits -- did not unreasonably apply federal constitutional law or make any unreasonable determinations of fact in finding his plea valid.  Although not adjudicated on the merits by the Wisconsin Court of Appeals, Orton's sentencing challenge is wholly without merit.  Accordingly, federal habeas relief is not available to Orton under 28 U.S.C. § 2254(a) or (d).

UNDISPUTED FACTS[1]

**A.  The Charges**

On August 27, 2009, Orton was charged in Dane County Circuit Court with attempted first-degree intentional homicide, strangulation, and aggravated battery of his estranged wife.  Although Orton disputed some of the circumstances, the underlying facts alleged were even more horrific than the charges themselves. According to the complaint, Orton entered his estranged wife's house on August 19, 2009, carrying a box containing wedding photos and a demolition mallet. His wife was in the middle of preparing a meal, and their two children, then aged 1 and 2, were in the kitchen area in their highchairs. Shortly after entering the home, Orton told her "tonight's the night you're going to die," then he proceeded to strangle her, slam her head repeatedly against the wall, and push her into a corner against the kitchen cabinets.  The complaint further alleged that Orton grabbed the demolition mallet and struck his wife multiple times in the head, leaving her lying in a pool of blood.  After leaving the house, Orton called 911, stating that he had just killed his wife and his children were at the house alone.  Although she survived, his wife suffered serious injuries to her hand, skull, and face.

**B.  Trial Court Proceedings**

On January 31, 2011, Orton entered a plea of no contest to attempted first-degree intentional homicide in exchange for the State's agreement to dismiss and read-in the

---

[1] The facts are drawn from the record of the state court proceedings and the Wisconsin Court of Appeals decision on Orton's direct appeal, *State v. Orton*, 2013AP1237-CR (Ct. App. Oct. 1, 2015) (dkt. #8-4).

aggravated battery and strangulation charges.  The trial court began the plea colloquy with

Orton by asking him if the plea agreement had been stated correctly on the record, which

Orton confirmed.  The court next asked and the defendant answered as follows:

> Q:    Have you had enough time to speak to your attorney about this?
>
> A:    I have.
>
> Q:    You know of course that this case was to have gone to trial, is scheduled for trial beginning one week from today and continuing for eight days?
>
> A:    Yes.
>
> Q:    And today by entering a plea you're giving up your right to have that trial, is that correct?
>
> A:    I am, your Honor.

(Tr. of Plea Hrg. (dkt. #8-9) 3.)  In response to further questions about his age, years of

schooling, and history of mental illness, Orton volunteered that he was 41 years old, had

12 years of schooling, and had been diagnosed in jail with bipolar disorder and ADHD.

Orton also reported that he was taking an antidepressant, but expressly denied that this

medication interfered with his ability to understand the proceedings or communicate

effectively with his attorney.  (*Id*. 4:6-12.)

The court then turned to Orton's understanding of the constitutional rights he was

waiving by pleading no contest.  As relevant here, the court again asked Orton:  "Do you

understand that by entering a plea to Count 1, you are giving up your right to have a

trial?," and he replied, "I do."  (*Id*. 4.)  After further discussion of his rights at trial and the

court's role, Orton was asked if he had any questions about what his plea meant, to which

Orton responded, "no." (*Id*. at 7.) Relying on the facts in the criminal complaint and Orton's examination at the plea hearing, the court found Orton's plea was factually supported and entered knowingly, intelligently and voluntarily.

Before sentencing, Orton provided the author of the presentence report a very different version of the facts surrounding his offense than appears in the criminal complaint. In particular, Orton had told the presentence report writer that the attack on his wife was not premeditated, but rather began as a mutual fight that spiraled out of control, with him grabbing her by the neck in response to her kick to his groin and her head striking the stove as they fell to the ground. He further said that his wife grabbed for the mallet first, and only then did he grab the mallet and strike her with it once. Orton also claimed that his children were not present during the altercation.

To refute that characterization, the State presented the following, three witnesses at sentencing:

> Madison Detective Denise Armstrong, one of the first officers to respond to the 911 call, who testified about her observations at the scene, including how law enforcement officers found the children screaming in their highchairs, and her interview with the victim;
>
> Howard Rowley, M.D., chief of neuroradiology at the University of Wisconsin Hospital, who testified that scans of the victim's head showed multiple sites of injuries, including scalp lacerations and swelling, skull fractures, bruising behind the eye, and bleeding inside the brain, which he opined were caused by direct trauma; and
>
> Nick Stahlke, a blood stain pattern specialist from the Wisconsin State Crime Laboratory, who testified that blood stains on the refrigerator were consistent with high force contact to an already-bloody source.

4

[cite?]  The State also presented photographs and diagrams of the scene, phone logs, and audio recordings of voicemail messages Orton left with friends immediately after the attack. In those messages, Orton said his wife made him "crazy," that he had beaten her with a hammer, and that he thought she was dead.  The victim provided a statement as well, describing how Orton brutally attacked her and struck her with a mallet as her two young children screamed while looking on from their highchairs.  Finally, several friends and family members of both Orton and the victim made statements.

Unsurprisingly, the sentencing court rejected Orton's description of the attack as set forth in the presentence report.  The court found "no doubt" that the attack was a premeditated attempt to kill the victim, noting that the testimony of Dr. Rowley and Stahlke "convince me that this wasn't just one blow to the head triggered as a response to an attack by [the victim] on Mr. Orton.  These were multiple blows." (Sentencing Tr. (dkt. #8-10) 180:14-19.)  The court also found that Orton did not put the mallet into the box to hang photos on the wall, but brought it "for another purpose," and that a phone call chart presented by the State indicated Orton was not at the victim's home long enough for a domestic dispute to have escalated out of control.  Describing the nature of the offense, the court found that the attack was "vicious and horribly brutal," as evidenced by:  (1) Orton's strangling of the victim before hitting her with the mallet; (2) his statements to her during the attack; and (3) the fact that he called the victim's mother after the attack and told her he had just killed her daughter.  The court explicitly found "incredible" Orton's suggestion that his wife rummaged for the mallet first.

Overall, the court found Orton's attempt to shift the blame to the victim showed a

lack of remorse.  The court further found, among other things, that Orton's demeanor during pretrial proceedings was "not good," noting that he had caused multiple delays by repeatedly firing his attorneys.  In the court's view, Orton's conduct during the pretrial proceedings was designed primarily to manipulate the court and the victim.  Taking this and a variety of other sentencing factors into account, the court ultimately sentenced Orton to 30 years' imprisonment, consisting of 22 years of confinement to be followed by 8 years of extended supervision.

### C.  Postconviction Motions

On October 6, 2011, more than eight months after his sentencing, Orton filed a motion to withdraw his plea on grounds of ineffective assistance of counsel.  In particular, Orton claimed that his attorney, Mark Frank, had told him that if he entered a no contest plea, he could withdraw it at any time before sentencing for any reason whatsoever and proceed to trial.

The trial court held an evidentiary hearing on the motion, at which both attorney Frank and Orton testified.  (Tr. of Postconviction Mot. Hrg. (dkt. #8-11).)  Before Orton entered his plea, Frank testified that they had very detailed discussions about the standards for plea withdrawal.  Frank testified that he also explained to Orton the standards for withdrawing a plea both before and after sentencing, and told Orton in particular that it would require more than a "simple change of heart" to withdraw the plea even before sentencing.  Frank specifically denied telling Orton that entering a plea of no contest was "no big deal."  To the contrary, Frank was confident Orton understood that the entry of his plea was a "huge deal" because, after putting it off for as long as he could, Orton had

finally concluded that entering a plea "was the only wise and proper action to take." (*Id*. 6:17-7:1.) Frank also specifically denied that Orton had asked him to file a motion to withdraw the plea before sentencing, although he had discussed the *possibility* of plea withdrawal with Orton after receiving a psychological report completed by Dr. Kent Berney before sentencing.

In the end, Frank testified he and Orton had agreed that it would be unwise to seek a plea withdrawal. (*Id*. 8:14-19.) As Frank explained, "withdrawing the plea would not have changed the evidence that would have been admissible at trial," which is what led to Orton's decision to enter the plea in the first place. (*Id*. 9:2-6.) In response to questioning by the court, Frank testified that although Orton had mental health issues, Frank had no reason to question Orton's competence, nor that he had entered his plea of no contest freely, knowingly, and voluntarily. (*Id*. 21:14-20.)

In contrast, Orton testified that Frank said he could withdraw his plea for any reason before sentencing *and* he entered the plea only because Frank had said this. Orton also claimed that when asked during the plea colloquy if he understood that he was giving up the right to a trial, he thought the judge was referring to the right to the trial scheduled a week from the plea hearing, not his right to have *any* trial. Orton testified further that after entering his plea, he asked attorney Frank to file a motion to withdraw it, but Frank refused, stating that the court would never accept it. Orton testified that he went along with Frank's judgment on this because the judge had warned him that Frank was his "last

lawyer and I better listen to him."[2]  (*Id*. 22-29.) Orton's friend, Chad Catlin, also testified that Orton had relayed Frank's advice that he could withdraw his plea at any time up to the date of sentencing.

Upon completion of the testimony, the circuit court denied Orton's motion to withdraw.  Noting that a defendant claiming ineffective assistance of counsel must show both deficient performance *and* prejudice, the court found no deficient performance by Frank.  In particular, the court found Frank's testimony about his discussions with Orton to be credible, and Orton's testimony to be incredible.  (*Id*. 54-58.)  In addition to finding Orton's testimony about what Frank told him about the plea "simply not believable," the court noted that, during numerous pretrial proceedings, Orton never had a problem communicating his wishes to his attorneys nor to the court.  In fact, the court noted that Orton had been successful in persuading the court to terminate his attorney's representation "five separate times."  (*Id*. 56:14-25.)  For this reason, the court observed that Orton not only had the "ability to communicate, but that he took every single court proceeding seriously."  (*Id*. 57:1-6.)  Thus, the court reiterated that Orton's suggestion his plea hearing was "just another step on the way to his eventual trial" was "completely inconsistent with all of the prior record of this case" and "simply not credible."  (*Id*. 57:2-6.)  Instead, the court found Orton's motion could "best be characterized as second thoughts, a change of heart by Mr. Orton."  (*Id*. 58.) The court similarly rejected Catlin's

---

[2] In fact, during a hearing on October 6, 2010, after Orton had discharged his fifth attorney, the trial judge did warn Orton that if he "continue[d] to engage in repeatedly failing to cooperate with your attorney or repeatedly discharging your attorney," she would find that Orton had forfeited his right to counsel by conduct, and Orton would then have to proceed *pro* se.  (Hrg. Tr. (dkt. #8-6) 8-9.)  Attorney Frank was Orton's sixth attorney.

testimony, noting that he had been in the courtroom for all of Orton's testimony and appeared merely to parrot it.

After Orton retained private counsel, his first postconviction counsel withdrew and the court granted his new counsel's request to file a supplemental postconviction motion raising new claims.  In that supplemental motion, Orton asserted that his plea was not entered knowingly, intelligently or voluntarily both because he misunderstood that he was waiving his right to trial *and* because he was on antidepressants at the time.  Orton further argued that he was sentenced on the basis of inaccurate information, presenting 12 factual findings by the court that he claimed were wrong, which he sought to challenge by presenting more information, including that (1) Orton's attack on his wife was premeditated and (2) Orton had manipulated the court proceedings.

The circuit court denied the supplemental motion without holding another evidentiary hearing, finding it "inconceivable" that Orton understood at the plea hearing that he was only giving up his right to have a trial the following week, antidepressants or not.  (Hearing Tr. (dkt. #8-12) 9:15.)  As for the new sentencing challenge, the court acknowledged her error in stating at the time of sentencing that petitioner had *fired* five attorneys since two of the five previous lawyers had withdrawn for reasons apparently unrelated to petitioner's conduct.  (Hearing Tr. (dkt. #8-12) 34:4-9.)  However, the court indicated that it had *not* relied on that particular number of attorneys in finding that Orton had manipulated the system, and found again that regardless of the precise number of attorneys Orton fired, it remained the case that multiple, additional hearings had been required because of Orton's actions.  (*Id*. 34:10-23.)  Finally, the court found "all of the

other 11 disputed so-called facts are really disputes that go to the underlying offense, "which "are not subject to anymore finding after the entry of a plea to these charges." (*Id*. 35:16-23.)

## D. Direct Appeal

Following the circuit court's postconviction rulings, Orton appealed, arguing that: (1) the trial court's credibility findings as to what Frank told Orton regarding his ability to withdraw his plea were clearly erroneous; (2) his plea was not knowing, voluntary, or intelligent because he entered it with the erroneous belief that he could withdraw it at any time before sentencing for any reason; (3) his mental health problems also affected his decision-making abilities to enter a valid plea; and (4) the trial court relied on inaccurate information at sentencing.

In an unpublished opinion, the Wisconsin Court of Appeals rejected these arguments and affirmed his conviction. *State v. Orton*, 2015 WI App 90, 365 Wis. 2d 606, 871 N.W.2d 866 (Table). Specifically, the court found that: (1) Orton's challenge to the trial court's credibility findings failed to acknowledge "long-standing case law" leaving those determinations to "the fact-finder, not this court," *id*. ¶ 3; (2) the trial court had already rejected Orton's testimony "about what his belief was" at the time he entered his plea of no contest after an evidentiary hearing on his first postconviction motion, making a second hearing on that issue unnecessary, *id*. ¶ 5; (3) the mental health testimony that Orton later wished to present "would not have specifically addressed what Orton's understanding of the plea was," *id*. ¶ 6; and (4) the trial court was not required to hold a hearing to "revisit facts that were actively disputed at sentencing, and on which testimony

10

was taken and findings made," merely because Orton raised those same disputes as a claim of "inaccurate information," adding that "If Orton wants to claim that the findings at sentencing are inaccurate, he can challenge them directly.  However, he does not make that argument." *Id*. ¶ 8.

The Wisconsin Supreme Court subsequently denied Orton's petition for review, and he now seeks federal habeas relief, reasserting the same three claims raised in his postconviction motions and on appeal to the state court of appeals.

DISCUSSION

When a state prisoner challenges a state court conviction on grounds that were adjudicated on the merits in state court, the state court's decision is subject to review under the Anti-Terrorism and Effective Death Penalty Act (AEDPA).  Under AEDPA, the petitioner must establish that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d).  "A decision is 'contrary to' clearly established federal law if the rule . . . applie[d] differs from governing law set forth in Supreme Court cases.  A decision involves an 'unreasonable application' of Supreme Court precedent if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002), and *Williams v. Taylor*, 529 U.S. 362, 407 (2000)).  The court applies these standards to the decision of the last state court to adjudicate a given claim on

the merits, which in this case is the Wisconsin Court of Appeals. *Williams v. Bartow*, 481 F.3d 492, 497–98 (7th Cir. 2007).

Under § 2254(d)(2), a federal court may also grant habeas relief on the grounds that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. But again, the federal court owes deference to the state court. In particular, the underlying state court findings of fact and credibility determinations against the petitioner are presumed correct unless the petitioner comes forth with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013).

Finally, the standard outlined in § 2254(d)(1) is exacting and "highly deferential," *Burt v. Titlow*, 571 U.S. 12, 18 (2013). To prevail, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Put another way, so long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable, the court must deny the petition. *See Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016). Accordingly, this court will proceed to address petitioner's three challenges to his judgment of conviction using this exceptionally deferential standard of review.

12

## I. Ineffective Assistance of Counsel

In *Hill v. Lockhart*, 474 U.S. 52, 57 (1985), the United States Supreme Court held that claims of ineffective assistance of counsel in connection with the plea process are evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this test, the defendant must show:   (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, defendant would not have pleaded guilty and would have insisted on going to trial.  *Id*. at 59.

As noted above, the trial court recognized that to prevail on his ineffective assistance of counsel claim, petitioner had to show both deficient performance by attorney Frank *and* prejudice.  The court found that petitioner had not shown deficient performance, finding petitioner's version of events "not credible."  The Wisconsin Court of Appeals affirmed this finding on direct appeal.

Petitioner first argues that the Wisconsin Court of Appeals' decision was unreasonable because it failed to cite *Hill* or *Strickland*.  While neither the Wisconsin Court of Appeals, nor the circuit court cited these cases, they did not need to do so, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Here, the trial court plainly recognized that petitioner's ineffective assistance of counsel claim was governed by the two-part, performance/prejudice test, and the Wisconsin Court of Appeals appears to have recognized those requirements as well.  Regardless, neither their reasoning nor the result contradicted *Strickland* or *Hill*.

Moving from the law to the facts, Orton argues that the trial court was simply wrong to reject his testimony regarding what attorney Frank advised would be the consequences of pleading "no-contest." This argument gets petitioner exactly nowhere since "a determination of a factual issue made by a State court shall be presumed to be correct," unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Credibility findings, in particular, are virtually unassailable on collateral attack in a federal court. *See Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."); *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (explaining that federal habeas courts owe a high level of deference to state court credibility determinations); *Morgan v. Hardy*, 662 F.3d 790, 799 (7th Cir. 2011) (showing deference to state trial court's credibility determinations under § 2254(d)(2)).

Here, the state appellate court was required to defer to credibility findings by the state trial court, and federal courts must defer to the findings of state courts. Given this double layer of deference, not to mention that attorney Frank's version of events is far more plausible, petitioner cannot prevail on his claim that he received ineffective assistance in connection with his decision to plead no contest.

Indeed, even if the court were allowed to reexamine the state court record more closely, the trial court expressed more than ample reasons to reject petitioner's claim that attorney Frank advised him that he could withdraw his plea at any time prior to sentencing for any reason whatsoever, including the trial court's own observations of petitioner

14

confirming not once but twice that he was waiving his right to trial during the plea colloquy itself, the petitioner's and frank's credibility while testifying, and the circumstances leading up to petitioner's last-minute plea just before trial in the face of overwhelming evidence of guilt.  At most, petitioner points out that the trial court misspoke in stating that petitioner had *discharged* five attorneys, agreeing that the number he fired was only three, although petitioner still went through five attorneys before settling on Frank.  As the Wisconsin Court of Appeals correctly found, "it is not reasonable to believe that this one error on a specific point altered the court's overall credibility findings after hearing testimony on numerous other points."  *Orton*, 2015 WI App 90, ¶ 3.  In fact, the trial court only noted petitioner's history of discharging prior attorneys as further evidence of his willingness to make his wishes known to the court, a tendency that the court found contradicted his claimed reticence in attempting to withdraw his plea before sentencing.   Whether petitioner had discharged three or five attorneys would have made no difference in reaching this conclusion, nor does it begin to explain why the petitioner, supposedly believing that he had an absolute right to withdraw his plea before sentencing, did not even attempt to do so.

In sum, petitioner has failed to produce any evidence, and certainly not evidence that is "clear and convincing," to rebut the trial court's determination that attorney Frank's version of events was the more credible.  Accordingly, petitioner has not established that the Wisconsin Court of Appeals unreasonably applied *Hill* or *Strickland* in upholding a finding that attorney Frank had not provided deficient performance in connection with petitioner's no-contest plea, much less that it was prejudicial.

## II.  Whether the Plea Was Knowing, Intelligent and Voluntary

Next, petitioner challenges the refusal of the state courts to hold an evidentiary hearing on his late raised, postconviction claim that his plea was not entered knowingly, voluntarily, or intelligently.  A guilty or no-contest plea is invalid unless the record shows that the defendant entered his plea knowingly and voluntarily.  *Boykin v. Alabama*, 395 U.S. 238 (1969).  The Wisconsin Court of Appeals agreed with the trial court that an additional hearing was not necessary because:  (1) at the first postconviction hearing, the trial court had already rejected petitioner's testimony about his claimed understanding of the consequences of his plea; and (2) the mental health testimony that petitioner wanted to present would not have addressed his understanding of the plea.  *State v. Orton*, 2015 WI App 90, ¶ 6.

As already set forth above, petitioner does not and cannot dispute that at the first hearing, the trial court found his claimed understanding of the consequences of his plea to be incredible, a finding of fact that petitioner has wholly failed to contradict, as was his burden under 28 U.S.C. § 2254(e)(1).  Accordingly, this court will turn to petitioner's second claim regarding his alleged mental health issues at the time of his plea.  The evidence that petitioner sought to present at the second evidentiary hearing postconviction consisted of the testimony of Dr. Kent Berney, who was asked before the sentencing hearing to provide an opinion regarding petitioner's psychological state.  (Appellant's Br. (Dkt. # 8-2) 18.)  Although Dr. Berney found petitioner had periods of time where he is distractible, indecisive, and unable to concentrate, petitioner does not cite any statement in Dr. Berney's report suggesting that petitioner was unable to enter a knowing and

voluntary plea, much less that he was incompetent, as petitioner now suggests in his brief. Likewise, although petitioner points out that he was taking anti-depressants and an anti-seizure medication at the time of his plea, he presents nothing to suggest that those medications *actually* affected his ability to understand the proceedings or make a knowing and voluntary plea.  In fact, petitioner specifically *denied* that to be the case at the plea hearing, and attorney Frank likewise saw no reason to question either petitioner's competence at the hearing or the validity of his plea.  In light of these facts, the Wisconsin Court of Appeals reasonably determined that testimony from Dr. Berney would not have raised a question as to whether petitioner's plea was knowing and voluntary, making a second evidentiary hearing unnecessary.

Accordingly, petitioner has wholly failed to demonstrate entitlement to federal habeas relief form his long since accepted, well-founded plea of no contest.

### III.  Sentencing

Finally, petitioner argues that the Wisconsin Court of Appeals erred in rejecting his claim that he was sentenced based on inaccurate information in violation of the Due Process Clause of the United States Constitution.  *See Ben–Yisrayl v. Buss*, 540 F.3d 542, 554 (7th Cir. 2008) (citing *Townsend v. Burke*, 334 U.S. 736 (1948) (Due Process Clause guarantees a defendant the right to be sentenced based on accurate information); *United States v. Tucker*, 404 U.S. 443, 448-49 (1972) (same).  To establish such a violation, however, the petitioner must again show by "clear and convincing evidence" both that the information is false and that the court relied on it.  *United States v. Walton*, 907 F.3d 548,

17

552 (7th Cir. 2018); *State v. Coffee*, 2020 WI 1, ¶38, 389 Wis. 2d 627, 650, 937 N.W. 2d 579.   Not all inaccuracies deprive a defendant of due process; the incorrect information must be "materially untrue." *Townsend*, 334 U.S. at 741.   In *Townsend*, the Supreme Court found a due process violation where the sentencing court, in the absence of counsel, relied on materially false information about a criminal defendant's criminal history in making its sentencing decision.   334 U.S. at 741.   Relying on *Townsend*, the Supreme Court in *Tucker* similarly overturned a sentence where the sentencing judge had considered two prior convictions subsequently invalidated for violation of the defendant's right to counsel.   404 U.S. at 447.

Finding that petitioner's appeal challenged only the trial court's failure to hold an evidentiary hearing on his supplemental motion, and not the trial court's sentencing determinations, the Wisconsin Court of Appeals did not consider the merits of petitioner's due process challenge to his sentence in this case.   *Orton*, 2015 WI App 90, ¶ 8 ("If Orton wants to claim that the findings at sentencing are inaccurate, he can challenge them directly.   However, he does not make that argument.").   Having reviewed petitioner's appellate brief, this court is unable to agree with that characterization:   petitioner framed his argument as "The Court Relied on Inaccurate Information When Sentencing the Defendant," cited the relevant legal standards, and proceeded to address seven specific findings by the trial court that he claimed were inaccurate.   (Appellant's Br. (dkt. #8-2) 18-37.)   He also asked that the case be "remanded for resentencing."   (*Id*. 37.)   In this court's view at least, petitioner squarely presented a constitutional challenge to his sentencing before the Wisconsin Court of Appeals.

18

No doubt for this reason, in opposing the grant of habeas relief, the State does *not* rely on the Wisconsin Court of Appeals' opinion, arguing instead that "[t]here is ample evidence in the record to support the circuit court's findings of fact" at sentencing. (Br. in Opp. (dkt #14) 30).) By so arguing, the State is tacitly conceding that petitioner fairly challenged the constitutionality of the trial court's actual sentencing findings, not simply its failure to hold a postconviction hearing on that claim. The consequence of that concession is potentially significant in that AEDPA's review standards do not apply because the Wisconsin Court of Appeals did not adjudicate the claim on the merits. Instead, this court analyzes the claim under pre-AEDPA standards. *See Moore v. Parke*, 148 F.3d 705, 708 (7th Cir. 1998) (holding that AEDPA only applies where the state court adjudicated the constitutional issue on the merits). Under pre-AEDPA standards, the federal court presumes that questions of fact decided by the state court are correct, while questions of law or mixed questions of law and fact are reviewed *de novo*. *Dye v. Frank*, 355 F.3d 1102, 1107 (7th Cir. 2004)(citations omitted).

As noted above, petitioner challenges seven facts that he contends the trial court relied on in imposing sentence. Of the seven, the first four challenge the accuracy of the trial court's conclusion that his attack on his wife was premeditated; the next two go to the heinous nature of his actions; and the last concerns what the court found to be Orton's manipulation of proceedings. Specifically, petitioner challenges the following findings by the trial judge:

> (1) petitioner knew the box he was carrying into his wife's home contained a demolition mallet;

> (2) he was only in his wife's home for a minute before he

started strangling her;

(3) he struck his wife in the head with the mallet multiple times;

(4) his wife did not strike him with the mallet first;

(5) his children witnessed the attack;

(6) he smoked a cigarette in the home before calling 911; and

(7) petitioner manipulated the court proceedings.

Having considered petitioner's argument on each of these points, *see* Br. in Supp. (dkt. # 11) 19-36, this court finds no merit in petitioner's claim that he was denied his due process rights at sentencing, even under the more lenient pre-AEDPA standards. As an initial matter, there is no evidence that the court found petitioner smoked a cigarette before calling 911. That fact was alleged by petitioner's wife, and it may also have been in the presentence report, but the trial court did not refer to it at any time during his remarks. Because there is nothing to suggest that the court relied on this fact, petitioner is unable to prove by clear and convincing evidence one of the two prongs of his due process challenge as to finding no. 6.

As for the remaining findings, petitioner fails to present any evidence to show that they were inaccurate. Rather, his argument seems to be that there is evidence from which the court *could* have drawn a contrary *inference*. As an initial matter, a sentencing court may consider a broad range of information in the sentencing process, provided that the evidence contains a "sufficient indicia of reliability." *United States v. Polson*, 285 F.3d 563, 568 (7th Cir. 2002). Moreover, the court may draw reasonable inferences from the evidence

20

presented.  *United States v. Melendez*, 819 F.3d 1006, 1011 (7th Cir. 2016); *State v. Friday*,

147 Wis. 2d 359, 370, 434 N.W.2d 85 (1989).

Here, there was ample, reliable evidence to support each of the court's findings, as

petitioner's own brief demonstrates.  First and foremost was the victim's own, compelling

description of the attack, which depicted vicious, premeditated actions by the petitioner,

not the marital-dispute-gone-bad version advanced by petitioner at sentencing.  Moreover,

the victim's version was corroborated – and petitioner's version refuted -- by her injuries,

the expert testimony indicating multiple blows to the head, the blood stain evidence, the

diagram and photographs of the scene, phone records, and the testimony of police arriving

at the scene of the attack in response to petitioner's 911 call.  Given the consistency of this

evidence, the trial court reasonably inferred that petitioner put the demolition mallet in

the box with the intent to use it to kill his wife, and that he in fact did so, striking her

multiple times with it.  The record also provided ample support for the trial court's finding

that petitioner's children witnessed the attack, as testified to by the victim and

corroborated by the report of Detective Armstrong who found them exactly as the victim

described moments after the attack.  Finally, the judge reasonably concluded that

petitioner had manipulated the court proceedings.  As noted previously, regardless whether

petitioner discharged three and not five attorneys, the court had more than an ample basis

to conclude that petitioner was responsible for delaying the trial multiple times and that

in doing so, he manipulated the court proceedings and the victim.  Whether petitioner

acted out of an inability to accept the consequences of his own action, process them or

inflict further injury out of sense of somehow being wronged, this federal court is in no

position to second-guess the state trial court's assessment of petitioner's demeanor, actions and motives, especially given that court's unique ability to observe his behavior over numerous court proceedings. *See Miller v. Fenton*, 474 U.S. 104, 114 (1985) (state court determinations of credibility of witnesses and demeanor entitled to deference).

In sum, petitioner has failed to show that *any* of the facts upon which the trial court actually relied were inaccurate. To the contrary, the record contained ample, reliable evidence to support the court's determination that petitioner's attack on his wife was premeditated, and committed in front of his infant children, as well as that he had manipulated the court proceedings after his arrest. Accordingly, his due process rights were not violated.

## IV. Certificate of Appealability

The last issue the court must consider is whether to issue a certificate of appealability of this final order adverse to the petitioner. See 28 U.S.C. § 2253(c)(2); Rule 11 of the Rules Governing Section 2254 Cases. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). To make a substantial showing, petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation omitted). Here, petitioner has fallen short of showing a denial of a constitutional right. At bottom, he

22

simply wants a do-over of his plea and sentence.  Because this is not a proper ground for habeas relief, no certificate shall issue.


ORDER

IT IS ORDERED that Gerald Orton's application for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED and his petition is DISMISSED with prejudice.  No certificate of appealability shall issue.

Entered this 28th day of May, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge